**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL AEROSPACE QUALITY GROUP A.I.S.B.L., | ) CIVIL ACTION<br>)<br>) No. _____ |
| Plaintiff, | )<br>) **JURY TRIAL DEMANDED** |
| vs. | )<br>) |
| SAE INTERNATIONAL, | ) **FILED ELECTRONICALLY**<br>) |
| Defendant. | )<br>) |

**COMPLAINT**

Plaintiff International Aerospace Quality Group A.I.S.B.L. ("IAQG"), by and through undersigned counsel, brings this Complaint against Defendant SAE International ("SAE"), and alleges as follows:

**PRELIMINARY STATEMENT[1]**

1.      IAQG brings this action against SAE for declaratory judgment and breach of contract arising from SAE's wrongful repudiation and subsequent breach of the parties' May 12, 2022 International Standards Development, License and Publication Agreement (the "License Agreement").

2.      The License Agreement granted SAE an exclusive license to publish IAQG's AS9100 family of aerospace quality-management standards through May 12, 2032, and required SAE to transfer copyright in each Standard to IAQG upon initiation of revision under the Transition Cycle set forth in Appendix 1.

---

[1] Capitalized terms not defined in the Preliminary Statement are defined in the Factual Background.

1

3. Under the terms of the License Agreement, SAE was responsible for Intellectual Property and Copyright Management, and in particular was responsible for negotiating, and administering, and paying requisite royalties to ANSI / ISO so as to ensure that the Standards containing ISO content could be published.

4. In the Spring of 2026, the IAQG was informed that SAE no longer had the license from ANSI to publish work containing ISO content which would have made it impossible for SAE to publish a number or critical standards.

5. On April 28, 2026, IAQG sent SAE a demand for adequate assurance of SAE's ability to perform under the License Agreement.

6. Rather than provide the adequate assurance, SAE responded by declaring the License Agreement a "nullity", arguing that that the License Agreement had "lapsed", "due to disappearance of the subject," and that IAQG had materially breached the License Agreement.

7. On May 18, 2026, IAQG terminated the License Agreement under Article 14 based on SAE's failure to provide adequate assurance of performance. Notwithstanding the termination, SAE has continued to publish, distribute, sell, market, and otherwise commercially exploit the AS Standards and IA Standards on its website and through other commercial channels. SAE has publicly announced its intent to continue doing so beyond the wind-down period.

8. The central dispute between the parties concerns IAQG's ownership of and right to use the copyrights in the AS9100 family of quality-management standards (the "AS Standards") that were initiated for revision by the parties under the Transition Cycle, which AS Standards thereafter become "IA Standards.,"(collectively the "Standards")  Through the IAQG-1 Standards Council's substantive Final Voting Step approval process, IAQG initiated revision of at least twenty-one (21) existing AS-prefixed Standards between May 12, 2022 and May 18, 2026.

2

9. SAE has selectively acknowledged that one Standard (IA9137) is IAQG-owned while denying IAQG's ownership of and continuing to commercially exploit the other twenty-one AS Standards and IA Standards under the same legal framework.

10. By this action, IAQG seeks: (a) declaratory relief establishing the validity of the License Agreement until IAQG's May 18, 2026 termination and IAQG's ownership of and right to use both the AS Standards (for which IAQG has initiated revision) and the IA Standards; (b) damages for SAE's breaches of the License Agreement; (c) specific performance for the transfer and assignment of all AS and IA Standards that "entered into" the License Agreement and were registered for copyright by SAE; and (d) such other relief as the Court deems just and proper.

## PARTIES

11. Plaintiff IAQG is an international not-for-profit association (Association Internationale Sans But Lucratif) organized under the laws of the Kingdom of Belgium, with its registered seat at 3 rue Abbé Cuypers, Brussels 1040 Belgium, and registered with the Belgian Crossroad Bank of Enterprises under enterprise number 543.909.583. IAQG maintains a U.S. mailing address at 700 12th Street NW, Suite 700-92450, Washington, D.C. 20005.

12. Defendant SAE International is a Pennsylvania not-for-profit corporation under 26 U.S.C. § 501(c)(3), with its principal place of business at 400 Commonwealth Drive, Warrendale, Pennsylvania 15096. SAE maintains a permanent office in this District at 901 15th Street NW, Suite 520, Washington, D.C. 20005.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) (claims relating to copyrights, including declaratory judgment claims related to ownership and use of copyrights under the U.S. Copyright Act), 28 U.S.C. § 1332(a)(2) (alienage diversity, with the

3

amount in controversy exceeding $75,000 exclusive of interest and costs), and 28 U.S.C. § 1367 (supplemental jurisdiction).

14.     This Court has personal jurisdiction over SAE because SAE conducts continuous and systematic business in the District of Columbia, including through its Washington D.C. office at 901 15th Street NW, Suite 520, where it regularly conducts business in this District including related to the aviation related AS and IA Standards that are the subject of this suit, and because a substantial part of the events and conduct giving rise to IAQG's claims has substantial contacts with this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a).

## FACTUAL ALLEGATIONS

### A.     *The Parties and the AS9100 Family of Standards*

16.     Plaintiff IAQG is a global aerospace quality consortium whose member companies include the leading aerospace original equipment manufacturers and suppliers in the world.

17.     SAE is a not-for-profit standards-development association founded in 1905. SAE develops consensus-based standards primarily for the automotive and aerospace industries.

18.     Beginning in the late 1990s, aerospace industry leaders and stakeholders engaged with SAE to form what would become IAQG.

19.     From the late 1990s through 2013, IAQG operated as an aerospace standards consortium under SAE's organizational structure, including operating through SAE's G-14 aerospace standards committee.

20.     During this period, SAE and its affiliate SAE Industry Technologies Consortia ("SAE-ITC") provided the then-unincorporated IAQG consortium with overall consortium

4

management, financial, logistical, and legal services, IT support, standards development tools, and governance frameworks.

21.    The AS9100 family of quality-management standards (the "AS Standards"), which are the dominant aerospace quality-management standards relied on by aerospace manufacturers and suppliers worldwide, were developed by IAQG and IAQG's predecessor consortium using SAE's standards development program and tools.

22.    The substantive technical content of those Standards is the work of IAQG and its member-company representatives.

23.    In 2013, SAE spun out IAQG and established IAQG as a separate legal entity, organized as an international not-for-profit association.

24.    Following IAQG's establishment as a separate legal entity, SAE continued to provide IAQG with various services, including financial services, standards development tools, and IT support, and SAE continued to publish, distribute, and market the AS9100 family of Standards developed by IAQG, under an arrangement under which SAE held the copyrights in the Standards.

25.    Starting in or about 2020, IAQG began discussions with SAE concerning IAQG's increased role in the commercial exploitation of the Standards developed by IAQG.

26.    Those discussions culminated in the parties' agreement to (a) transition the copyrights in the AS Standards from SAE to IAQG; (b) grant SAE an exclusive, time-limited license to publish, distribute, and sell the Standards through May 12, 2032; and (c) provide for certain mutual rights of first refusal between the parties on derivative works and new initiatives.

27. The essential bargained-for exchange of the parties' agreement was IAQG's grant of exclusivity to SAE through 2032 in return for the transition of copyright ownership in the AS Standards to IAQG.

28. The parties memorialized that agreement in the License Agreement, effective May 12, 2022.

**B.    *The 2022 License Agreement***

29. On May 12, 2022, IAQG (as Licensor) and SAE (as Licensee) executed the License Agreement. A true and correct copy of the License Agreement is attached as Exhibit A.

30. The License Agreement governs the parties' rights and obligations with respect to the AS9100 series of standards (the "Standards").

31. Specifically, under the License Agreement:

a. IAQG is acknowledged as the content creator of the Standards. § 3.7 ("The copyright on Approved Derivative Works are fully owned by IAQG"); § 5.5 ("the Licensor shall retain the sole ownership and rights to the Standards … including the copyright, trademark and Licensor shall retain ownership of the intellectual property rights");

b. The copyright in the AS Standards transitions from SAE to IAQG on a schedule set forth in Appendix 1 (the "Transition Cycle"), with each Standard transitioning when revision is initiated under the new system. § 3.1(a);

c. IAQG grants SAE an exclusive, time-limited license to publish, distribute, and sell the Standards through May 12, 2032. §§ 3.1, 7.1, 7.2;

d. SAE pays IAQG royalties on a tiered formula. § 8.4;

e.  SAE performs specified publication and operational functions, including managing the existing ANSI/ISO agreement (§ 8.1), providing intellectual property and copyright management "(including management of the SAE copyright permission with ISO)" (§ 8.2(f)(1)), and "Negotiation, Administration and Payment of ANSI/ISO Royalty" (§ 8.2(f)(3));

f.  SAE expressly covenants that it "will not engage or participate in any activity or course of action that could diminish or tarnish the image or reputation of the Standards or IAQG, or cause confusion as to the ownership of the Standards." § 10.3(a);

g.  SAE warrants that its publication of the Standards "will not infringe, misappropriate, or otherwise violate the intellectual property or other rights of any third party or violate any applicable regulation or law." § 10.3(b);

h.  Termination rights run only to IAQG, as Licensor. § 14.1 ("Licensor may terminate this Agreement … if the Licensee has failed to respect its contractual obligations and such failure has not been remedied within thirty (30) days"); § 14.2 (additional Licensor termination rights). SAE has no contractual right to terminate the License Agreement, other than as a result of IAQG's bankruptcy or judicial settlement under Article 11, neither of which has occurred;

i.  Upon expiration or termination, "Licensee will immediately and definitively cease to use the Copyrighted Works and all related materials," with a thirty-day wind-down period for orderly transition. §§ 13.1, 14.4. In addition, § 13.1 expressly requires that on termination Licensee "take immediate measures to permanently

7

discontinue all use of IAQG Intellectual Property Rights, including, without limitation, the copyright rights, trademarks and names;"

j.  The License Agreement is governed by Belgian law. § 17.1; and

k.  The License Agreement preserves to the non-breaching party the right to seek equitable relief from any court for breach or threatened breach: "The parties acknowledge[] that a breach by the other party of this Agreement may cause irreparable damages, for which an award of damages would not be adequate compensation, and agrees that, in the event of such breach or threatened breach, the non-breaching party will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which such party may be entitled at law or in equity." § 18.9.

32.  From May 2022 through 2024, IAQG and SAE performed under the License Agreement.

33.  SAE published the Standards under the License Agreement, and SAE paid royalties to IAQG pursuant to § 8.4.

34.  At all times during this period, SAE recognized IAQG's copyright ownership in the Standards as contemplated by §§ 3.1, 3.7, and 5.5 and IAQG Policy 104 (incorporated into the License Agreement by reference at Appendix 3, § 1.1).

35.  SAE also exercised its duties under §§ 8.1 and 8.2(f) to manage the ANSI/ISO licensing relationship for the publication of Standards containing ISO content, without ever suggesting that those duties belonged to IAQG.

*C.*      *IAQG's Performance of the Transition Cycle Under the License Agreement (2022-2026)*

36.      Section 3.1(a) of the License Agreement provides that "[t]he transition of copyright of the Standards to IAQG (and subsequent license of such content to SAE hereunder) shall be in accordance with the Transition Cycle set forth in Appendix 1."

37.      Appendix 1 establishes that "[e]xisting SAE/IAQG 91xx published standards … will enter this agreement when revision is initiated," and that Work-in-Process Standards "will be published under this agreement."

38.      By operation of these provisions, the copyright in each AS Standard was to transition from SAE to IAQG when IAQG initiates a revision of an existing Standard, including the Work-in-Progress Standards. The standards resulting from IAQG's revisions to the AS Standards, as well as new standards developed by IAQG under the License Agreement, are referred to herein as the "IA Standards".

39.      IAQG's transition work is conducted through the IAQG-1 Standards Committee operating under the IAQG Standards Council Organization and Operating Procedures incorporated as Appendix 3 to the License Agreement. The IAQG-1 Standards Council process includes multiple substantive committee approval stages, culminating in a "Final Voting Step" requiring substantive consensus approval by Voting Members representing the producer, user, and general interest constituencies of the IAQG-1 Standards Committee.

40.      From May 12, 2022 through May 18, 2026, IAQG has initiated and performed revisions of, or initial development of, at least the following twenty-one (21) AS Standards. The copyright in each such AS Standard should have transitioned to IAQG under § 3.1(a) and Appendix 1 of the License Agreement (each Standard identified by its post-transition IA designation, with its pre-transition AS or ARP designation in parentheses):

9

a. IA9100 (AS9100D), Quality Management Systems — Requirements for Aviation, Space, and Defense Organizations;

b. Final Standards Council IA9101 (AS9101F), Quality Management Systems — Audit Requirements;

c. IA9102 (AS9102B), Aerospace First Article Inspection Requirement;

d. IA9103 (AS9103A), Variation Management of Key Characteristics;

e. IA9104/1 (AS9104/1A), Requirements for Aviation, Space, and Defense Quality Management System Certification Programs;

f. IA9104/2 (AS9104/2A), Requirements for Oversight of Aerospace Quality Management System Registration/Certification Programs;

g. IA9104/3 (AS9104/3A), Requirements for Aerospace Auditor Competency and Training Courses;

h. IA9107 (ARP9107A), Direct Delivery Authorization Guidance for Aerospace Companies;

i. IA9110 (AS9110C), Quality Management Systems — Requirements for Aviation Maintenance Organizations;

j. IA9114 (ARP9114B), Direct Ship Guidance for Aerospace Companies;

k. IA9115 (AS9115A), Quality Management Systems Deliverable Software;

l. IA9116 (AS9116), Notice of Change Requirements;

m. IA9117 (AS9117), Delegated Product Release Verification;

n. IA9120 (AS9120B), Quality Management Systems — Requirements for Aviation, Space, and Defense Distributors;

o. IA9131 (AS9131D), Nonconformity Data Definition and Documentation;

10

p.  IA9132 (AS9132B), Data Matrix Quality Requirements for Parts Marking;

q.  IA9133 (AS9133A), Qualification Procedure for Aerospace Standard Products

r.  IA9136 (ARP9136), Aerospace Series — Root Cause Analysis and Problem Solving;

s.  IA9138 (AS9138), Statistical Product Acceptance Requirements;

t.  IA9145 (AS9145), Requirements for Advanced Product Quality Planning and Production Part Approval Process;

u.  IA9146 (AS9146), Foreign Object Damage Prevention Program Requirements;

v.  IA9147 (AS9147), Unsalvageable Items Management Requirements; and

w.  IA9162 (AS9162), Aerospace Operator Self-Verification Programs.

41.    Under Section 3.1(a) and Appendix 1 of the License Agreement, IAQG should be the legal owner of the copyrights in both (a) each AS Standard for which IAQG has initiated revision under the License Agreement, including each of the twenty-one AS Standards identified above, and (b) the corresponding IA Standards developed by IAQG. SAE retains no copyright or other proprietary interest in any AS Standard or IA Standard for which IAQG has initiated revision under the License Agreement.

42.    As of the date of this Complaint, at least four IA Standards have completed all required IAQG voting steps and are "Ready for Publication" but have not been published by SAE: (a) IA9101 has been Ready for Publication since April 1, 2026; (b) IA9104/1 has been Ready for Publication since May 11, 2026; (c) IA9104/2 has been Ready for Publication since April 18, 2024 — a period of more than two years; and (d) IA9104/3 has been Ready for Publication since July 18, 2024 — a period of nearly two years. Each of these Standards is awaiting completion of translation.

43. SAE's own conduct contemporaneous with the Transition Cycle confirms the parties' understanding that copyright transition occurs upon initiation of revision.

44. Beginning in 2022 and continuing through 2026, SAE itself marked each Standard with the "IAQG Copyright" designation when SAE issued the Standard for initial balloting through the IAQG-1 Standards Committee Voting Step approval process.

45. SAE applied this same "IAQG Copyright" designation to IA9137, which SAE has now acknowledged is IAQG-owned, and to each of the twenty-one initiated Standards identified in paragraph 40 above. SAE's own practice of marking each and every Standard with the "IAQG Copyright" designation is evidence of the parties' clear and unequivocal intent that under the License Agreement the copyrights in each initiated Standard had transitioned to IAQG.

46. Further, SAE's role as publisher under § 8 of the License Agreement requires SAE to publish IA Standards in accordance with the parties' established schedule.

47. SAE's failure to publish IA9101, IA9104/1, IA9104/2, and IA9104/3 is a material breach of the License Agreement.

## D.    *The IAQG Authentication Program Dispute and the W.D. Pa. Action*

48. In or about September 2024, IAQG announced that it would consolidate certain aerospace auditor authentication activities into an IAQG Authentication program.

49. On February 24, 2025, SAE filed suit against IAQG in the United States District Court for the Western District of Pennsylvania, captioned *SAE International v. International Aerospace Quality Group A.I.S.B.L.*, Civil Action No. 2:25-cv-00268-WSH (the "W.D. Pa. Action").

50. SAE sought a preliminary injunction and declaratory relief based on SAE's claimed right of first refusal under § 4.2 of the License Agreement. SAE's complaint alleged that the

License Agreement was a binding and enforceable contract and sought relief under its express terms. SAE thereafter prosecuted the W.D. Pa. Action substantively, including by filing a motion for preliminary injunction with supporting memorandum, supporting declarations, and proposed findings of fact and conclusions of law, and by seeking and engaging in expedited discovery.

51. On August 26, 2025, the W.D. Pa. court granted IAQG's motion to dismiss the W.D. Pa. Action for lack of personal jurisdiction over IAQG.

52. On September 3, 2025, SAE filed a Motion to Alter or Amend the Judgment under Federal Rule of Civil Procedure 59(e), seeking reconsideration of the dismissal.

53. At all times during the W.D. Pa. Action, SAE asserted that the License Agreement was a binding and enforceable contract and treated it as judicially enforceable.

### E. The ISO 9001:2026 Issue and SAE's December 1, 2025 Communication

54. The Standards published under the License Agreement, including the AS9100 family of quality-management standards, incorporate content from international standards developed by the International Organization for Standardization ("ISO"), most notably ISO 9001.

55. Throughout the term of the License Agreement, SAE held the license arrangement with the American National Standards Institute ("ANSI"), the U.S. Member Body of ISO, that authorized SAE to publish standards containing ISO content.

56. SAE's management of that ANSI relationship was an express obligation under §§ 8.1 and 8.2(f) of the License Agreement.

57. On information and belief, in 2025, ISO began work on a revised version of ISO 9001 to be released in 2026 ("ISO 9001:2026"). Publication of any Standard incorporating ISO 9001:2026 content would require an updated or extended ISO/ANSI license sufficient to cover the new content.

58. On or about December 1, 2025, SAE presented IAQG with a letter, drafted by SAE on IAQG letterhead, requesting that IAQG sign and issue the letter to ANSI (the "December 1 Letter"). A true and correct copy of the December 1, 2025 letter is attached hereto as Exhibit B.

59. The letter would have designated SAE as IAQG's "authorized representative for the limited purpose of engaging with the American National Standards Institute (ANSI), or any applicable National Standards Body, to request, negotiate, and enter into the necessary license(s) for the use of underlying ISO content incorporated into IAQG standards." (*See* Ex. B).

60. In presenting the December 1 Letter, SAE represented to IAQG that the requested designation was a "standard procedural requirement" and an "administrative requirement." (*Id*.).

61. Those representations were materially false. In fact, the December 1 Letter was not a standard procedural or administrative requirement; it was a request that IAQG confer upon SAE authority that the License Agreement does not provide and that IAQG was not contractually obligated to grant.

62. The License Agreement requires IAQG to provide SAE with an authority letter only for purposes of investigating and enforcing copyright infringement of the Standards. § 3.1(b); License Agreement Appendix 2 (Form of Letter of Authority).

63. The December 1 Letter was, in substance, an admission that SAE itself recognized it needed authorization to engage with ANSI regarding ISO content licensing.

64. Under §§ 8.1 and 8.2(f) of the License Agreement, SAE was the party contractually charged with managing the ANSI/ISO relationship.

65. IAQG declined to sign the December 1 Letter.

14

*F.*    *SAE's March 26, 2026 "Path Forward" Proposal and IAQG's April 3, 2026 Response*

66.    On March 26, 2026, Peter Doty, then SAE's Executive Vice President and Chief Operating Officer (interim), wrote to IAQG President Eric Jefferies proposing a "Path Forward" resolution (the "March 26 Letter"). A true and correct copy of the March 26 Letter is attached as Exhibit C.

67.    The March 26 Letter proposed five elements, including (among other things) an agreement that AS standards would be revised and transitioned to IA standards only when substantive, technical revisions are necessary.

68.    The fact that SAE proposed the substantive-revisions requirement as an amendment to the License Agreement itself is an admission that the existing License Agreement does not require substantive, technical revisions for transition.

69.    In other words, had the existing Agreement contained such a requirement, SAE would not have needed IAQG's agreement to add it.

70.    On April 3, 2026, Mr. Jefferies responded on behalf of IAQG (the "April 3 Letter"). A true and correct copy is attached as Exhibit D.

71.    The April 3 Letter declined SAE's request to amend the License Agreement to limit transitions to "substantive, technical revisions" and offered SAE two alternative settlement options. SAE did not accept either option.

*G.*    *SAE's Manufactured ISO Crisis and IAQG's April 28, 2026 Demand for Adequate Assurance*

72.    In or around April 2026, IAQG was informed by both ISO and ANSI that SAE's then-current license to publish Standards containing ISO content would not extend to the ISO 9001:2026 content.

15

73.     That information created substantial and reasonable grounds for IAQG to be concerned about SAE's continuing ability and authority to perform under the License Agreement.

74.     On April 28, 2026, Mr. Jefferies wrote to David Alexander, SAE's Senior Director of Aerospace Standards, formally demanding adequate assurance of SAE's continuing ability to perform under the License Agreement (the "April 28 Demand Letter"). A true and correct copy is attached as Exhibit E.

75.     The April 28 Demand Letter demanded that SAE provide written confirmation that SAE possessed the full legal authority and continuing rights necessary to publish, distribute, market, and exploit the Standards worldwide on an exclusive basis for the full term of the License Agreement.

76.     The April 28 Demand Letter expressly reserved IAQG's rights, including the right to treat failure to provide adequate assurance as a repudiation and/or material breach.

### H.    SAE's May 1, 2026 Response

77.     On May 1, 2026, Mr. Doty responded to the April 28 Demand Letter on behalf of SAE (the "May 1 Letter"). A true and correct copy is attached as Exhibit F.

78.     Rather than provide the adequate assurance IAQG had demanded, the May 1 Letter asserted—for the first time in the parties' four-year contractual relationship—that the License Agreement was "null and void." (*See* Ex. F).

79.     The May 1 Letter advanced four alternative theories in support of that position:

   a.  that the License Agreement was a nullity under Belgian Civil Code articles 1108, 1126–1128, and 1131 (former Code), on the asserted ground that IAQG could never obtain a global ISO license;

16

b.  that the License Agreement lapsed under Belgian law on the asserted ground that IAQG's revisions to transitioned Standards are "extremely limited, not substantive, and merely cosmetic in nature"; and

c.  that IAQG materially breached the License Agreement on the basis that (1) the transition period for the Standards has taken too long (even though SAE has failed to publish four Standards that are ready for publication); (2) IAQG's creation of the its own Auditor Authentication Program (which was already the basis of the WD PA lawsuit); and (3) IAQG is excluding SAE from industry meetings.

80.     Each of SAE's four asserted theories is contradicted by the text of the License Agreement, the parties' four-year course of performance, and SAE's own contemporaneous conduct.

81.     The nullity theory contradicts the License Agreement, which assigned the management of the ANSI/ISO relationship to SAE itself under §§ 8.1 and 8.2(f), and the parties' course of performance, in which SAE managed that relationship for four years without challenge.

82.     The lapse theory presupposes a contractual requirement of "substantive, technical revisions" that does not exist in the License Agreement and that SAE itself sought to add by amendment in the March 26 Letter.

83.     The material breach and rescission theories lack any substantive basis.

84.     Moreover, each of SAE's theories is contradicted by SAE's own contemporaneous conduct.

85.     SAE marked each initiated Standard with the "IAQG Copyright" designation when initiating the AS Standard for revision — a designation that SAE itself applied and that reflected SAE's own understanding of the operation of the Transition Cycle.

17

86.    The May 1 Letter contained no confirmation that SAE retained the legal authority and operational capacity to perform under the License Agreement.

87.    To the contrary, the May 1 Letter affirmatively confirmed the substance of the impediment to performance that IAQG's April 28 Demand Letter had identified.

## I.    IAQG's May 5, 2026 Response

88.    On May 5, 2026, Mr. Jefferies responded to the May 1 Letter (the "May 5 Letter"). A true and correct copy is attached as Exhibit G.

89.    The May 5 Letter acknowledged SAE's confirmation that SAE could not provide adequate assurance of performance; reserved all of IAQG's rights; disputed SAE's null-and-void framing; and proposed counsel-to-counsel negotiation.

## J.    SAE's May 8, 2026 Escalation

90.    Rather than engage in the counsel-to-counsel negotiations IAQG had proposed, SAE took three coordinated actions on May 8, 2026.

91.    First, Mr. Doty wrote to Mr. Jefferies a "final notice" letter reaffirming each of SAE's four theories and declaring the License Agreement "null and void ab initio," lapsed, or rescinded (the "May 8 Letter"). A true and correct copy is attached as Exhibit H.

92.    Second, SAE filed in the W.D. Pa. Action a Notice of Withdrawal of Plaintiff's Motion for Reconsideration. A true and correct copy is attached as Exhibit I.

93.    Notably, the Notice of Withdrawal contains the following representation:

> Even though IAQG has formally announced the launch of IAQG Authentication this April 2026, SAE has determined that the Parties were never able to perform their respective obligations under the Agreement, rendering the Agreement null and void under Belgian law. Therefore, SAE has decided to withdraw its Motion for Reconsideration.

(Ex. I ¶ 5).

18

94.     On May 11, 2026, the W.D. Pa. court entered an order acknowledging SAE's withdrawal of the Rule 59(e) motion, thereby finalizing the W.D. Pa. court's August 26, 2025 dismissal of the W.D. Pa. Action.

95.     Third, on or about May 8, 2026, SAE issued a public statement titled "SAE International Statement on SAE-IAQG Agreement" (the "Public Statement"). A true and correct copy is attached as Exhibit J.

96.     The Public Statement was disseminated to aerospace industry stakeholders worldwide, including stakeholders located in this District, including but not limited to, Michelle Barton, Marisela Reyes, Andy Maher, Pete Lukas, Amy Cochis, Marlene Meadows, Mark Rodriguez, and Craig Bennett.

97.     The Public Statement contains material misstatements of fact, including: (i) attributing the failure of the License Agreement to "unresolvable difficulties, including those outside the Parties' control; (ii) implying that SAE, rather than IAQG, is the legitimate continuing steward of the AS9100 family; and (iii) being issued unilaterally without coordination with IAQG, in violation of Appendix 3, § 9.1 of the License Agreement.

**K.      IAQG's May 18, 2026 Termination of the License Agreement Under Article 14**

98.     On May 18, 2026, Mr. Jefferies wrote to Mr. Doty terminating the License Agreement under Article 14 (the "May 18 Termination Letter"). A true and correct copy is attached as Exhibit K.

99.     The May 18 Termination Letter terminated the License Agreement effective immediately based on SAE's failure to provide adequate assurance.

100.     Accordingly, as of May 18, 2026, the License Agreement was terminated by IAQG's exercise of its Article 14 termination right, subject to a 30-day winddown period.

19

*M.      Post-Termination Correspondence and SAE's May 28, 2026 Position*

101.    On May 21, 2026, IAQG's counsel sent SAE a cease-and-desist letter demanding that SAE: (i) cease and desist from reproducing, publishing, distributing, selling, offering for sale, licensing, sublicensing, translating, hosting, displaying, communicating to the public, or creating derivative works of any of the Standards, except as expressly permitted by § 14.4 during the wind-down period; (ii) cease and desist from holding SAE out as authorized to commercially exploit the Standards following termination; (iii) cease and desist from soliciting or entering into any arrangement with any third party for the purpose of commercially exploiting the Standards; (iv) retract or prominently correct the May 8 Communications; (v) take the steps required by §§ 13.2 and 14.4 of the License Agreement; and (vi) provide IAQG with a written undertaking confirming compliance. A true and correct copy of the cease and desist letter is attached hereto as Exhibit L.

102.    On May 28, 2026, SAE's Belgian counsel responded to the May 21 Letter on behalf of SAE (the "May 28 Letter"). A true and correct copy is attached as Exhibit M.

103.    The May 28 Letter confirmed: (a) SAE's continued maintenance of its position that the License Agreement is "null and void," has "at least lapsed," or has been rescinded; (b) SAE's express acknowledgment that "IAQG successfully had one new IAQG copyrighted standard published via the process laid out in the License Agreement, in particular the IA9137"; (c) SAE's confirmation that "SAE has pulled IA9137 from its website"; and (d) SAE's continued denial of IAQG's ownership of, and continued commercial exploitation of, the twenty-one other IA Standards identified in paragraph 18 above.

104.    SAE's selective acknowledgment of IA9137, combined with its denial of the same legal framework for the twenty-one other IA Standards, is internally inconsistent.

20

105. The License Agreement's Transition Cycle applies uniformly to all AS Standards on Appendix 1 for which IAQG initiates revision, and SAE has identified no contractual basis for distinguishing IA9137 from the twenty-one other IA Standards.

106. On June 19, 2026, Gregory Bradley, the Executive Vice President, and Chief Legal Officer of SAE, wrote a letter to the CEO of The Boeing Company demanding the return of any original or modified AS91XX standard, claiming that SAE owns them both.

107. Mr. Bradley went on to gratuitously and falsely state in that letter that Eric Jefferies had been recruiting and unwitting individuals employed by the companies that permitted their employes to volunteer for the IAQG, and further stated the unauthorized appropriation was part of a scheme by Mr. Jefferies to exploit SAE's underlying copyrighted content.

## O.    *Harm to IAQG*

108. SAE's conduct has caused, and continues to cause, IAQG substantial harm, including: (a) imminent loss of the bargained-for value of the License Agreement through May 12, 2032, including lost royalty streams under § 8.4 and lost publication value; (b) lost royalty and publication value resulting from SAE's failure to publish IA9101, IA9104/1, IA9104/2, and IA9104/3, each of which is Ready for Publication; (c) costs incurred by IAQG to remediate SAE's breach, including costs of separate copyright registration, costs of securing alternative publication arrangements, and costs of remediation with industry stakeholders; (d) reputational harm and loss of goodwill resulting from SAE's Public Statement and other communications; (e) interference with IAQG's relationships with aerospace industry stakeholders, including manufacturers, suppliers, regulators, certification bodies, and member companies; (f) disruption of the standards-development apparatus contemplated by the License Agreement; and (g) loss of control over the dissemination of IAQG's Standards.

109.    The harms IAQG has suffered and will continue to suffer absent equitable relief are irreparable.

110.    The License Agreement itself acknowledges as much in § 18.9: "The parties acknowledge[] that a breach by the other party of this Agreement may cause irreparable damages, for which an award of damages would not be adequate compensation, and agrees that, in the event of such breach or threatened breach, the non-breaching party will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which such party may be entitled at law or in equity."

111.    Loss of control over IAQG's intellectual property, loss of an exclusive market position, and disruption of the standards-development apparatus cannot be adequately compensated by money damages alone.

## COUNT I
## DECLARATORY JUDGMENT REGARDING VALIDITY OF THE LICENSE AGREEMENT AND IAQG'S ARTICLE 14 TERMINATION

112.    IAQG incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

113.    An actual controversy exists between IAQG and SAE concerning the validity of the License Agreement, the existence and nature of the parties' respective obligations under it, and IAQG's exercise of its termination right under Article 14.

114.    Pursuant to 28 U.S.C. § 2201 and the Declaratory Judgment Act, IAQG is entitled to declarations that:

a. The License Agreement was a valid and enforceable contract from its execution on May 12, 2022 through IAQG's May 18, 2026 termination;

22

b. The License Agreement is not, and never has been, null and void ab initio under Belgian law or any other applicable law;

c. The License Agreement did not lapse by operation of Belgian law or any other applicable law prior to IAQG's May 18, 2026 termination;

d. IAQG has not materially breached the License Agreement; and

e. IAQG validly terminated the License Agreement effective May 18, 2026 pursuant to Article 14 based on SAE's failure to provide adequate assurance of performance.

WHEREFORE, Plaintiff International Aerospace Quality Group A.I.S.B.L. respectfully requests that this Court enter judgment in its favor and against Defendant SAE International, awarding IAQG its costs of suit; and granting such other and further relief as this Court deems just and proper.

**COUNT II**
**DECLARATORY JUDGMENT REGARDING**
**COPYRIGHT OWNERSHIP AND USE OF THE STANDARDS**

115. IAQG incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

116. IAQG created new standards the (IA Standards) and was to be transferred ownership over the pre-existing standards from SAE from which the IA Standards were derived (the AS Standards).

117. The License Agreement reflects the parties' clear and unequivocal agreement to transfer copyright ownership in each Standard from SAE to IAQG in accordance with the Transition Cycle.

118. An actual controversy exists between IAQG and SAE concerning the ownership and use of the copyrights in each Standard for which IAQG initiated revision under the License

Agreement, and concerning ownership of the Work-in-Process Standards published under the License Agreement.

119.    Pursuant to 28 U.S.C. § 2201 and the Declaratory Judgment Act, IAQG is entitled to declarations that:

a.   Pursuant to § 3.1(a) and Appendix 1 of the License Agreement, the copyrights in each AS Standard for which IAQG initiated revision after May 12, 2022 — including each of the twenty-one AS Standards identified above — should have been transferred and assigned from SAE to IAQG upon initiation of such revision, with ownership vesting in IAQG in the resulting IA Standards transferred from SAE to IAQG upon initiation of such revision; IAQG should be declared the legal owner of the copyrights in each such AS Standard and IA Standard, and SAE should retain no copyright or other proprietary interest in any such AS Standard or IA Standard;

b.   Pursuant to § 5.5 of the License Agreement and the Work-in-Process provisions of Appendix 1, IAQG should be deemed the legal owner of the copyrights in each Standard first published under the License Agreement, including IA9137;

c.   Following the May 18, 2026 termination of the License Agreement and the expiration of the 30-day wind-down period under § 14.4 on June 17, 2026, SAE has no license, authorization, or other right to publish, distribute, sell, market, or otherwise commercially exploit any AS Standard or IA Standard for which IAQG has initiated revision under the License Agreement, or any IA Standard developed by IAQG under the License Agreement; and

d.  SAE is required to take all actions reasonably necessary to effectuate the transfer and/or assignment of the copyrights in all such IA Standards to IAQG.

WHEREFORE, Plaintiff International Aerospace Quality Group A.I.S.B.L. respectfully requests that this Court enter judgment in its favor and against Defendant SAE International, declaring IAQG the owner of the copyrights of the AS and IA Standards identified above; ordering SAE to take all actions necessary to effectuate the transfer and assignment of the copyrights in the AS Standards and IA Standards to IAQG; awarding IAQG its costs of suit; and granting such other and further relief as this Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT

120.    IAQG incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

121.    The License Agreement is a valid and binding contract between IAQG and SAE. IAQG has performed all conditions, covenants, and obligations required of it under the License Agreement.

122.    SAE has materially breached the License Agreement in multiple, independent respects:

a.  SAE failed to provide adequate assurance of performance under the License Agreement following IAQG's April 28, 2026 demand;

b.  SAE wrongfully repudiated the License Agreement by declaring it "null and void" in the May 1 Letter and May 8 Letter, notwithstanding that SAE has no contractual right to terminate, declare void, or rescind the License Agreement under Articles 11, 14, or 15;

c. SAE has failed to transfer the AS Standards and IA Standards to IAQG as required by §§ 3.1(a), 5.5, 13.1, 13.2, and the Transition Cycle in Appendix 1 of the License Agreement, including by: (i) failing to execute and record the assignments of the copyrights in the AS Standards (post-revision initiation) and the IA Standards to IAQG; (ii) failing to deliver to IAQG the working documents, electronic copies, source files, drafts, and related materials for the AS Standards and IA Standards in SAE's possession or control; and (iii) actively refusing to release standards-related materials, including by demanding that IAQG-affiliated Document Sponsors at IAQG member companies return AS-prefixed standards documents to SAE's StandardsWorks platform;

d. SAE has materially breached the License Agreement by failing to publish IA Standards that have completed IAQG's Final Voting Step approval process and are Ready for Publication, including IA9101 (Ready since April 1, 2026); IA9104/1 (Ready since May 11, 2026); IA9104/2 (Ready since April 18, 2024); and IA9104/3 (Ready since July 18, 2024);

e. SAE's May 1 Letter, May 8 Letter, and Public Statement breached SAE's covenant in § 10.3(a) of the License Agreement that SAE "will not engage or participate in any activity or course of action that could diminish or tarnish the image or reputation of the Standards or IAQG, or cause confusion as to the ownership of the Standards";

f. SAE issued the Public Statement unilaterally, in violation of Appendix 3, § 9.1 of the License Agreement, which requires that media inquiries be handled "in coordination with IAQG"; and

26

g. SAE failed to perform its obligations under §§ 8.1, 8.2(f)(1), and 8.2(f)(3) of the License Agreement with respect to the management of the ANSI/ISO licensing relationship, including with respect to the ISO 9001:2026 content.

123. As a direct and proximate result of SAE's breaches, IAQG has suffered substantial damages in an amount to be determined at trial, including but not limited to:

a. Lost royalties through May 12, 2032 under § 8.4 of the License Agreement;

b. Lost publication value and lost royalty income resulting from SAE's failure to publish IA9101, IA9104/1, IA9104/2, and IA9104/3, each of which is Ready for Publication;

c. Costs of cover and remediation, including costs of separate copyright registration, costs of securing alternative publication arrangements, and costs of stakeholder communications;

d. Reputational harm and loss of goodwill resulting from the Public Statement and SAE's other disparaging communications;

e. Costs of perfecting copyright transfer, including costs of cooperation and recordation that SAE has refused to undertake; and

f. Loss of the bargained-for value of the License Agreement.

WHEREFORE, Plaintiff International Aerospace Quality Group A.I.S.B.L. respectfully requests that this Court enter judgment in its favor and against Defendant SAE International, awarding: (a) compensatory damages in an amount to be proved at trial, including without limitation the categories of damages identified above; (b) pursuant to § 18.9 of the License Agreement, equitable relief including specific performance compelling SAE to transfer to IAQG the AS Standards and IA Standards, and injunctive relief enjoining SAE from further breach; (c)

27

pre-judgment and post-judgment interest; (d) IAQG's costs of suit; and (e) such other and further relief as this Court deems just and proper.

## COUNT IV
## SPECIFIC PERFORMANCE

124.    IAQG incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

125.    The License Agreement obligates SAE, upon termination, to (a) immediately and definitively cease use of the AS Standards, the IA Standards, and IAQG Intellectual Property Rights, including all copyrights, trademarks, and names (§ 13.1); (b) inactivate and erase all electronic copies of the AS Standards and IA Standards and return or destroy all tangible copies (§ 13.2); and (c) effectuate these obligations following the thirty-day wind-down period (§ 14.4).

126.    Section 18.9 of the License Agreement expressly preserves to the non-breaching party the right to seek equitable relief, including specific performance, for breach or threatened breach of the License Agreement: "The parties acknowledge[] that a breach by the other party of this Agreement may cause irreparable damages, for which an award of damages would not be adequate compensation, and agrees that the non-breaching party shall be entitled to seek equitable relief, including injunctions and specific performance, from any court of competent jurisdiction."

127.    Following IAQG's May 18, 2026 termination of the License Agreement and the expiration of the thirty-day wind-down period under § 14.4 on June 17, 2026, SAE has materially failed and refused to perform its post-termination obligations under §§ 13.1, 13.2, and 14.4.

128.    Among other things, SAE has continued to possess and control electronic and physical copies of the AS Standards and IA Standards; has refused to transfer those materials to IAQG; has continued to publish, distribute, and sell the AS Standards and IA Standards on its website and through other commercial channels; has continued to use IAQG trademarks and IA

designations; and has affirmatively demanded the return of standards-related documents from IAQG-affiliated Document Sponsors employed by IAQG member companies.

129.    IAQG's remedy at law is inadequate. The AS Standards and IA Standards, the source files and working materials for those Standards, and IAQG's ability to continue its standards development activities free from SAE's interference are unique and not capable of being adequately compensated by money damages alone.

130.    The post-termination obligations in §§ 13.1, 13.2, and 14.4 of the License Agreement are sufficiently definite and specific to support an order of specific performance.

131.    IAQG is accordingly entitled to specific performance of SAE's post-termination obligations under the License Agreement, including an order compelling SAE to: (a) immediately transfer to IAQG all electronic and physical copies, working drafts, source files, and related materials for the AS Standards and IA Standards in SAE's possession or control; (b) immediately and permanently cease all use, publication, distribution, sale, marketing, and commercial exploitation of the AS Standards, the IA Standards, IAQG trademarks, IAQG marks, IA designations, and IAQG names; (c) execute and record any and all documents reasonably necessary to perfect the transfer and assignment to IAQG of the copyrights in the AS Standards and IA Standards; and (d) cease any further communications with third parties demanding the return to SAE of standards-related documents or directing third parties to take any action inconsistent with IAQG's ownership of the AS Standards and IA Standards.

WHEREFORE, Plaintiff International Aerospace Quality Group A.I.S.B.L. respectfully requests that this Court enter judgment in its favor and against Defendant SAE International, ordering specific performance of SAE's post-termination obligations under the License Agreement

29

as set forth above; awarding IAQG its costs of suit; and granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff IAQG demands trial by jury on all claims and issues so triable.

Dated: June 22, 2026                    Respectfully submitted,


  /s/ Michael J. Allan
Michael J. Allan (D.C. Bar # 470278)
John William "Bill" Toth  (D.C. Bar # 1615883)
**STEPTOE LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
(202) 429-3902 (Facsimile)
mallan@steptoe.com
btoth@steptoe.com

Gerald J. Stubenhofer, Jr.
(motion for pro hac vice to be filed)
Joseph Lewis
(motion for pro hac vice to be filed)
**STEPTOE & JOHNSON PLLC**
One PPG Place, Suite 3300
Pittsburgh, PA 15222
(412) 504-8010
(412) 504-8011 (Facsimile)
Jerry.Stubenhofer@Steptoe-Johnson.com
Joseph.Lewis@Steptoe-Johnson.com